**FALSTAFF BEER, INC., Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 19935.**

United States Court of Appeals
Fifth Circuit.

Sept. 24, 1963.

Rehearing Denied Dec. 27, 1963.

Fred Woodley, San Antonio, Tex., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., William A. Friedlander, Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Crane C. Hauser, Chief Counsel, C. Owen Johnson, Atty., I.R.S., Washington, D. C., for appellee.

Before HUTCHESON, BROWN and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The question for decision is whether, under Section 162 of the Internal Revenue Code of 1954, 26 U.S.C.A. (1958)

§ 162,[1] certain payments made by a beer distributor to its predecessor in the business are deductible as "ordinary and necessary expenses paid or incurred during the taxable year in carrying on [the taxpayer's] business".

There are many cases dealing with what is an ordinary and necessary business expense. "They involve the appreciation of particular situations, at times with borderline conclusions." Welch v. Helvering, 1933, 290 U.S. 111, 116, 54 S.Ct. 8, 78 L.Ed. 212. Not all expenditures helpful to a business are *ordinary* or *necessary* or an *expense*. Some, as in Welch v. Helvering, come closer to being a capital outlay than being an ordinary expense. That is the case here.

The material facts are not disputed.

John J. Monfrey is the sole stockholder of the taxpayer corporation, Falstaff Beer, Inc. From 1949 to 1953 he was the Schlitz distributor in the Rio Grande Valley area of southern Texas. In 1953 Falstaff Brewing Corporation appointed Monfrey distributor for Falstaff beer in San Antonio. There was no written contract between Monfrey and Falstaff Brewing Corporation; the relationship could be terminated at will by either party. It was understood, however, that Falstaff's custom was not to terminate a distributorship without good reason.

The former Falstaff distributor in San Antonio, William A. Heusinger, introduced Falstaff into that area in 1937 or 1938. He spent money and effort in creating a customer demand for the beer. In the early 1950s Falstaff began to lose its place as a leader in the San Antonio market, and Heusinger, rather than invest additional capital in making improvements suggested by Falstaff Brewing Corporation, decided that he would prefer to sell his business. Monfrey, although not required by Falstaff to make any contractual arrangements with his predecessor, agreed to buy Heusinger's distributing business for $65,000, pay-able at the rate of three cents a case for every case of beer sold in the territory. The contract states that in consideration for this, Heusinger, on his part, agreed as follows:

"In consideration of which, I, the said William A. Heusinger doing business under the trade name of William A. Heusinger Company, have sold, assigned and delivered and by these presents to [sic] sell, assign and deliver to the said John J. Monfrey, *all that certain business owned and conducted by me* in Bexar County, Texas, known as William A. Heusinger Company, and *consisting of a Falstaff beer distributorship* covering Bexar County, Texas, * * hereby granting unto the said John J. Monfrey, *all good will and other intangible assets owned by William A. Heusinger Company in operation of such business.*"

At the time of the sale, no tangible property, operating licenses, or the name, "William A. Heusinger Company", passed under this contract. Several days later, however, Monfrey purchased Heusinger's beer inventory and some advertising material. He also employed some of Heusinger's office personnel and nine of his eleven truck drivers, who, of course, are key goodwill personnel because of their knowledge of their routes and close personal relation with customers.

The rationale of Section 162 has been well stated:

"Section 162 of the 1954 Code is intended primarily, although not necessarily, to cover expenditures of a recurring nature where the benefit derived from the payment is realized and exhausted within the taxable year. Accordingly, if as the result of the expenditure the taxpayer acquires an asset which has an economically useful life beyond the taxable year, or if it secures a like advantage to the taxpayer which has

---

1. Internal Revenue Code of 1954:
   "§ 162. Trade or business expenses:
   "(a) *In general.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *"

a life of more than one year, no deduction of such payment is allowable as a business expense. In such event, to the extent that a deduction is allowable, it must be obtained under the provisions of the Code which permit deductions for amortization, depreciation, depletion, or loss. However, it appears to be well settled that expenditures made to protect and promote the taxpayer's business, and which do not result in the acquisition of a capital asset, are deductible.

"Generally, the courts have sought to determine whether the expenditure in question has resulted in ultimate advantage to the taxpayer. If it has, the expenditure has been treated as representing a permanent improvement, that is, a capital expenditure; if it has not, it has been characterized as in the nature of current upkeep or repairs. The test of ultimate advantage or increase in value of the property is an unreliable guide. Assuming that the expenditure is ordinary and necessary in the operation of the taxpayer's business, the answer to the question as to whether the expenditure is an allowable deduction as a business expense must be determined from the nature of the expenditure itself, which in turn depends on the extent and permanency of the work accomplished by the expenditure. This issue is a factual one." Mertens, The Law of Federal Income Taxation, § 25.20 (1960).

The taxpayer's argument runs as follows. This transaction could not have been the sale of good will because there was no tangible asset to which the good will could attach. Heusinger's distributorship, like that of Monfrey's, was terminable at will by the brewery; moreover, Heusinger did not even part with his firm name. Since, therefore, the taxpayer gained no capital asset by its expenditures under the contract, the sums must have been paid for some other purpose, and that purpose was the payment of ordinary and necessary expenses needed from day to day to protect the taxpayer's business. Monfrey pointed out that when he became the Schlitz distributor in the Rio Grande Valley, his predecessor refused to sell his inventory; as a result, his predecessor was able to disrupt Monfrey's business for several ·months by making spot deliveries. He estimated that he lost over $20,000 in his Schlitz distributorship because of his predecessor's activities. Monfrey thought it well worth $65,000 to have a peaceful transaction with Heusinger in the larger San Antonio area. Since sums paid to protect a *going business* are deductible business expenses, the taxpayer contends that it is entitled to deduct the amount paid under the contract.

For a number of reasons we hold that the payments were in the nature of payments for good will.

It is not necessarily true that the good will of a business cannot be transferred apart from any tangible assets. For example, in Bird & Son, Inc. v. White, D.Ct.Mass.1936, 16 F.Supp. 168, the government argued that the assignment of a partnership's good will three days before the taxpayer acquired the actual business was invalid; the court, in disapproving this argument, held that as long as the taxpayer had in fact acquired the business and the assets used in carrying it on, it was immaterial that the good will was the first element of the business purchased. Still closer in point is Pevely Dairy Co., 1 B.T.A. 385 (1925). There the taxpayer, which sought to deduct as business expenses amounts paid for the customer lists of its vendors, contended "that good will does not exist by itself and must be attached, or incident to something tangible, and can be sold only in connection with the thing to which it is attached." The Board of Tax Appeals rejected this argument, stating:

"It is true that [good will] can exist only as an incident of a business, but it is not necessary that it be connected with a place of business, or a particular article, although that is

sometimes the fact. * * * [T]he term now includes all that good disposition of one's customers based upon reputation for skill, punctuality, or other incidental circumstances which constitute the good reputation one enjoys in a particular business as an incident thereof. [Citation omitted.] In this sense it is attached to the business and is subject to sale as a part of the business. To say it must be attached to something tangible is to deny that good will can be acquired in the conduct of a retail dairy business where the delivery is to the customer. In such cases there is no place to which good will can attach, and if it arises at all it must result from the product or the service rendered, and we think where the business consists of service it is capable of sustaining good will as an incident. Good will is not something which can be delivered like merchandise, but as recognized in all the definitions, it is the *probability* or *expectation* of retaining the old customers and that probability or expectation is all a purchaser can acquire."

In the present case the taxpayer did not, it is true, obtain a customer list directly from Heusinger. He did, however, purchase Heusinger's beer inventory only a few days after the purchase of the good will, and he hired nine of the eleven truck drivers. Viewing these transactions as a single business deal, which a realistic view of the situation requires, we cannot escape the conclusion that Monfrey paid $65,000 for the only good will Heusinger could sell.

On the facts, as the Tax Court held, and as we view them, the taxpayer stepped into a going concern, built up from scratch by Heusinger's services over the years. The taxpayer unquestionably received benefit from the relationships with the retailers which his predecessor had established. "The cost of good will in connection with the acquisition of the assets of a going concern is a capital expenditure." Regs.

§ 1.263(a)-2(h). The contract, in terms, provides that Heusinger "doing business under the trade name of William A. Heusinger Company * * * grant[s] * * * all good will and other intangible assets owned by William A. Heusinger Company in operation of such business". Heusinger testified that in negotiating with Monfrey he told him that he thought he was entitled to $65,000 for good will; that he was not the type to disturb the market. His testimony on this point was as follows:

"Q. What do you mean by good will and other intangibles in the contract?

"A. It's my understanding that good will is my 16 or 17 years of hard work that I put in that. I felt that I was entitled to some return on that, and I just had heard good will and that's what it meant to me.

"Q. Is that what you represented you were selling to Mr. Monfrey?

"A. Yes, sir.

"Q. That's what he agreed to buy?

"A. That's right."

■ If it be assumed, as the taxpayer contends, that the payments were to obtain a peaceable transition and to prevent Heusinger from competing or interfering with the market, the payments were not as ordinary and necessary business expenses. Payments for a peaceful market are a capital expenditure.

■ The sale of good will carries an implicit agreement to refrain from competing or interfering with the market. In Mutual Life Ins. Co. v. Menin, 2 Cir. 1940, 115 F.2d 975, 978, certiorari denied, 313 U.S. 578, 61 S.Ct. 1096, 85 L.Ed. 1536, the Second Circuit said that the voluntary sale of a business deprived the seller of the right to solicit his old customers. In Cooper & Co. v. Anchor Securities Co., 1941, 9 Wash.2d 45, 113 P.2d 845, the court said, 9 Wash.2d, p. 53, 113 P.2d p. 849 that:

" * * * The 'good will' of a business is that value which inheres in

the fixed and favorable consideration of customers arising from an established and well conducted business. The sale of the good will of a business carries the implied covenant by the seller that he will not solicit the custom for which the purchaser paid and the seller parted for the consideration he received therefor. Good will is 'property' in the legal sense of the term, and subject to sale in connection with the business precisely as other personal property is subject to sale."

See also Hall Mfg. Co. v. Western Steel & Iron Works, 7 Cir. 1915, 227 F. 588; Mouton, Inc. v. Hebert, C.A.La., 1940, 199 So. 172, 174–175; Colton v. Duvall, 1931, 254 Mich. 346, 350, 237 N.W. 48, 50. As the Louisiana court held in Mouton v. Hebert, it is unfair and tantamount to fraud, to sell a business with one hand and attempt to recapture its fruit with the other.

This case is analogous to the cases involving payments to protect future earnings by eliminating competition. It has been held that payments to protect earnings are capital expenditures. Dodge Brothers v. United States, 4 Cir., 1941, 118 F.2d 95; Clark Thread Co. v. Commissioner, 3 Cir. 1939, 100 F.2d 257. It has also been held that payments to eliminate competition are not deductible as business expenses. Clark Thread Co. v. Commissioner; Dane County Title Co., 29 T.C. 625 ( ); Hamlin's Trust v. Commissioner, 10 Cir. 1954, 209 F.2d 761, 765; KWTX Broadcasting Co. v. Commissioner, 31 T.C. 952 (1959); Babbitt, Inc. v. Commissioner, 32 B.T.A. 693 (1935). In Babbitt, Inc., the Board of Tax Appeals said (p. 696):

"The decided cases are to the effect that the cost of eliminating competition is a capital asset. Where the restraint or elimination is for a definite and limited term the cost may be exhausted over such term, Farmers Feed Co., 17 B.T.A. 507; Christensen Machine Co. [v. U. S.], 18 B.T.A. 256 [Ct.Cl.], 50 F.2d 282;

Black River Sand Corporation, 18 B.T.A. 490; News Leader Co., 18 B.T.A. 1212; Eitingon-Schild Co. [v. C. I. R.], 21 B.T.A. 1163; Eagle Pass & Piedras Negras Bridge Co., 23 B.T.A. 1337[,] 1338. On the other hand, where the benefits of restraint or elimination of competition are permanent or of indefinite duration, no deduction for exhaustion is allowable. Press Publishing Co., v. C. I. R., 17 B.T.A. 452; affirmed as Newspaper Printing Co. v. Commissioner, 3 Cir., 56 F.2d 125; Clark Thread Co. v. C. I. R., 28 B.T.A. 1128."

Van Iderstine Co. v. Commissioner, 2 Cir.1958, 261 F.2d 211, on which the taxpayer relies, is distinguishable. There the taxpayer, in order to obtain the necessary steady supply of raw materials, made lump sum payments from time to time to various individual suppliers. In holding for the taxpayer that these were deductible business expenses, the Second Circuit pointed out that where as the good will which "is the subject of purchase and sale always involves the relations of the seller with third persons," in that case the only "good will" involved was the seller's good will.

Monfrey's explanation, accepted at its face value, provides no basis for the deduction of the payments. These payments were in return for the seller's implicit but unrestricted promise not to disrupt the buyer's business. Coupled with Heusinger's sale of his beer inventory and the delivery of his organization to Monfrey, Heusinger disqualified himself from competing with a different beer, but the same drivers (salesmen) and customers. This resulted in an advantage to the taxpayer that unquestionably added value, permanently or at least for many years, to his new business, just as both parties testified. The value added is a capital asset; the expenditure was a capital expenditure, not an ordinary expense.

The judgment of the Tax Court is affirmed.