Darrell D. and Doris L. Hudgins, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 178–70SC. Filed December 21, 1970.

Darrell D. Hudgins, pro se.
*Richard D. Hall, Jr.*, for the respondent.

Irwin, *Judge:* The Commissioner determined a deficiency of $433.36 in petitioner's income tax for the calendar year 1967. Due to concessions stipulated by the parties, the sole issue for our determination is whether certain amounts paid by petitioners to Alabama Market Centers, Inc., represent a nondeductible capital expenditure.

FINDINGS OF FACT

Some of the facts have been stipulated by the parties. The stipulation, together with the exhibits attached thereto, are incorporated herein by this reference.

Darrell D. Hudgins (hereinafter petitioner) and his wife, Doris L. Hudgins, filed a joint Federal income tax return for the taxable year 1967 with the Internal Revenue Service Center, Chamblee, Ga.

At the time of the filing of the petition herein, they resided in Gardendale, Ala.

On or about August 7, 1967, petitioner paid $320 to the Alabama Market Centers, Inc. (hereinafter AMC), in order to become a distributor in the marketing plan of that organization. AMC's function was to operate a chain of department stores which apparently was patronized only by persons who had membership cards.

Desirous of improving his position within the framework of the organization to that of supervisor, petitioner paid an additional $2,100 to AMC on or about August 28, 1967.

The total cost of becoming a supervisor within AMC's promotional network is $2,420, which corresponds to the sum paid by petitioner to AMC in August 1967.

The agreement entered into by petitioner in order to become supervisor provided, in pertinent part, as follows:

[The present] Supervisor and Founder [here petitioner] agree that if the Founder desires to be installed as a Supervisor, the Founder shall pay to the Supervisor $1,800.00 in liquidated damages. Supervisor, however, agrees to allow, credit and forfeit $200.00 of this liquidated damage for each Founder one time retail sale made by said Founder prior to up grading to Supervisor. This payment to be made through the Area Coordinator along with the one time retail purchase application so that Alabama Market Centers, Inc. may properly process the application and verify the release of the Supervisor's contract, and pay future funds to the proper party.

Petitioner paid the "$1,800 in liquidated damages" directly to AMC which then drew two checks, one in the amount of $1,200 for R. G. Galbreath (hereinafter Galbreath), the supervisor at that time, and one in the amount of $600 for H. C. Hudgins, the distributor at that time.

These checks were given by petitioner to the two named payees on or about August 28, 1967, at a meeting of various AMC members

AMC advised its members of the various methods of earning income as a distributor or as a supervisor by attaching to its contract forms for membership supplemental sheets containing, in pertinent part, the following information:

VI. SEVEN ways to earn money as a Distributor.

1. You distribute one hundred (100) Purchase Authority Cards and earn level B commission (12% to 20%) each time one of your Purchase Authority Cards is used in an Alabama Market Center.

2. You earn a $60.00 commission each time you sell a one-time retail product thereby establishing a Founder as a Distributor in your Supervisor's organization.

3. You establish a Founder as a distributor in your Supervisor's organization and earn a $4.00 Monthly Recurral for as long as you and the Distributor remain active.

4. You establish a Founder as a Supervisor and earn a $600.00 Liquidated Damages fee.

5. You develop a Distributor to Supervisor and earn a $600.00 Liquidated Damages fee.

6. In addition to (2) and (3) above, you earn $200.00 credit for each Distributor you establish in your Supervisor's organization, provided you were sold by a Distributor, to be applied against the $1,800.00 Liquidated Damages fee you must present to your Supervisor when you up-grade to Supervisor (Maximum 6 credits).

7. In addition to (2) above, you earn $200.00 credit for each Distributor you establish in your Supervisor's organization, provided you were sold by your Supervisor, to be applied against the $1,800.00 Liquidated Damages fee you must present your Supervisor when you up-grade to Supervisor (maximum 9 credits).

*     *     *     *     *     *     *

VIII. EIGHT ways to earn money as a Supervisor.

1. You distribute one hundred (100) Purchase Authority Cards and earn level A commission (15% to 25%) each time one of your Purchase Authority Cards is used in an Alabama Market Center.

2. You earn an override level D commission (3% to 5%) each time a Purchase Authority Card of one of your Distributors is used in an Alabama Market Center.

3. You earn a $70.00 commission each time you sell a one-time retail product thereby establishing a Founder as a Distributor in your organization.

4. You establish a Founder as a Distributor in your organization and earn a $6.00 Monthly Recurral for as long as you and the Distributor remain active.

5. You earn a $10.00 override commission each time one of your Distributors establishes a Founder Distributor or Supervisor.

6. You earn a $2.00 Monthly Recurral for each Founder established in your organization as a Distributor by one of your Distributors for as long as you and the Distributor remain active.

7. You establish a Founder as a Supervisor or develop a Distributor you established to Supervisor and earn a $1800.00 Liquidated Damages fee, but forfeit a $200.00 credit to that Distributor for each Founder he established as a Distributor in your organization prior to his up-grading, not to exceed nine (9) credits.

8. You earn $1200.00 Liquidated Damages fee for each Founder established as a Supervisor by a Distributor in your organization, but forfeit a $200.00 credit to the establishing Distributor for each Distributor he established prior to his (the establishing Distributor) up-grading, not to exceed six (6) credits.

Petitioner, in computing his profit or loss from his sales and promotion business for the taxable year 1967, deducted $2,453 [1] as paid for membership in AMC, which respondent disallowed in its entirety as a nondeductible capital expenditure.

Of this total amount, the parties agree that $653 represented a nondeductible capital expenditure.

---

[1] Petitioner agrees that he erred in claiming $2,453, rather than $2,420 as the total paid to AMC in 1967.

OPINION

The issue presented to us for decision is whether $1,800 paid by petitioner to AMC is a nondeductible capital expenditure.

As we understand petitioner's argument on brief, the $1,800 constituted liquidated damages incurred as a result of the release of the contract between AMC and Galbreath, who was supervisor at the time petitioner was endeavoring to become supervisor within the promotional network of AMC. Since the $1,800 payment was to serve as damages for the voiding of this contract, petitioner contends that there is no "way that any capital gains can be earned from the $1,800." Therefore, he argues that the $1,800 was deductible in full in 1967.

We feel that petitioner is far too entangled with the terminology contained in the documents he executed in order to upgrade himself from distributor to supervisor. He is looking only to the form of the transactions involved herein and not to their substance.

First of all, it is important to remember that Galbreath had apparently contracted with AMC to serve as supervisor, which status petitioner was seeking. If the contract between Galbreath and AMC were to be rescinded or otherwise canceled, Galbreath had the right to look only to AMC for damages resulting therefrom. Apparently, AMC refused to bear this added cost of replacing one supervisor with another and required a new applicant for supervisor to pay to the organization $1,800 which, in turn, was to be paid to the supervisor who was to be replaced.

Petitioner purchased certain intangible contract rights from AMC, and, in particular, the right to earn income as a supervisor. In this respect, this situation is comparable to the purchase of property. In other words, petitioner acquired an intangible capital asset and it has been held that expenses incurred in connection with the purchase of a capital asset are capital expenditures. See, e.g., *Gant* v. *Commissioner*, 263 F. 2d 558 (C.A. 6, 1959), affirming a Memorandum Opinion of this Court. In that case, the taxpayer took over a distributorship for an oil company and agreed to pay the then distributor a fixed monthly sum for life. The Court of Appeals affirmed this Court's holding that the agreement was one for the purchase of capital assets and, as such, the contract payments constituted capital expenditures.

On brief, petitioner stated that *Gant* v. *Commissioner*, *supra*, and *Samuel Pardy*, T.C. Memo. 1962–117, both cited by respondent, are inapplicable to the case before us because neither involved payments made to void a contract. We appreciate the fact that petitioner represented himself and is not an attorney. Nevertheless, we must disagree with him as to the applicability of the principles involved in *Gant* v. *Commissioner*, *supra*, and *Samuel Pardy*, *supra*, to the facts before us.

Each case cited by respondent involved the acquisition of a capital asset. Petitioner also acquired a capital asset, viz, the contract rights of a supervisor within AMC's promotional network of operations. In order to acquire this asset, petitioner was required to pay $300 to AMC and an additional $1,800 as "liquidated damages" to the then supervisor, Galbreath. The resolution of the issue before us does not turn upon the terminology used to describe this $1,800 payment. It was a cost or expense of acquiring a capital asset, and constituted as such a capital expenditure. Therefore, we hold the deduction therefor was properly disallowed.

Since the amount of petitioner's adjusted gross income has been increased by virtue of a concession made by him, the medical expense deduction allowable must be adjusted in accord with that concession as well as with any conclusions reached herein on the remaining issue for consideration.

On brief, petitioner also asked the Court to rule that no interest be paid on any tax liability we may determine against him. However, this Court does not have jurisdiction in the matter of interest. *Commissioner* v. *Kilpatrick's Estate*, 140 F. 2d 887 (C.A. 6, 1944), affirming a Memorandum Opinion of this Court; *Riss & Co.*, 45 T.C. 230 (1965); *Estate of Mary Redding Shedd*, 37 T.C. 394 (1961), affd. 320 F. 2d 638 (C.A. 9, 1963).

Petitioner further requested us to deduct certain amounts from the deficiency since he was required to spend time and money with respect to the settlement and trial of this case. While we sympathize with petitioner, we have no authority to grant his request.

In order to reflect the concessions made by the parties and the conclusions reached herein,

*Decision will be entered under Rule 50.*