ELGIN B. ROBERTSON, JR., AND MARIAN G. ROBERTSON, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3088–71—3090–71, 3205–71. Filed March 13, 1974.

*Fred Lohmeyer*, for the petitioners.
*Bernard B. Nelson*, for the respondent.

---

[1] Cases of the following petitioners are consolidated herewith: Max C. Jordan and Margaret A. Jordan, docket No. 3089–71; Paul S. Neblett and Mary F. Neblett, docket No. 3090–71; and George B. LaLonde and Patsy LaLonde, docket No. 3205–71.

GOFFE, *Judge:* The respondent determined deficiencies in Federal income taxes of the petitioners as follows:

| Docket No. | Year | Amount |
|---|---|---|
| 3088–71 | 1967 | $3, 283. 98 |
| 3089–71 | 1967 | 2, 438. 55 |
| 3090–71 | 1967 | 3, 105. 26 |
| 3205–71 | 1967 | 1, 957. 53 |

Upon joint motion by the parties, these cases were consolidated for trial, briefs, and opinion.

Certain concessions have been made by the petitioners. The two remaining issues presented for decision are: (1) Whether the profit-sharing plan created by Elgin B. Robertson, Inc., was a qualified plan under section 401 of the Internal Revenue Code of 1954;[2] and (2) whether the payment of $8,500 as consultation fees by Elgin B. Robertson, Inc., to Penzner Associates constituted a deductible business expense under section 162.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated by this reference.

The petitioners in each of the cases are husband and wife. The joint Federal income tax returns of all of the petitioners for the taxable year 1967 were filed with the district director of internal revenue at Dallas, Tex. All of the petitioners except George B. LaLonde and Patsy LaLonde (docket No. 3205–71) resided in Dallas, Tex., at the time of filing the petition herein. The LaLondes resided in Mason City, Iowa, at that time.

Paul S. Neblett, Max C. Jordan, Elgin B. Robertson, Jr., and George B. LaLonde were shareholders and employees of Elgin B. Robertson, Inc. (hereinafter sometimes referred to as Robertson, Inc., or the corporation), throughout its fiscal year ended June 30, 1967, and through December 31, 1967. The corporation was organized under the laws of the State of Texas and had its principal office in Dallas, Tex. It was a manufacturers' sales representative in Texas, Kansas, and Oklahoma for electrical manufacturers who sold industrial, electronic, and utility equipment to electronic and aircraft businesses. The corporation was an electing subchapter S corporation for its taxable year ended June 30, 1967. The percentage of stock owned by each shareholder from July 1, 1961, through June 30, 1967, was as follows:

---

[2] All statutory references are to the Internal Revenue Code of 1954 as in effect during the taxable year at issue.

| Petitioner | Percentage | Petitioner | Percentage |
|---|---|---|---|
| Elgin B. Robertson, Jr. | 18.18 | Max C. Jordan | 15.05 |
| Paul S. Neblett | 18.18 | E. L. Snyder | 15.05 |
| Chester M. Davis | 18.18 | Gilbert E. Robertson | .31 |
| George B. LaLonde | 15.05 | | |

On July 1, 1961, all of the shareholders, except Gilbert E. Robertson, entered into a "Profit Sharing Employment Contract" (contract) with the corporation. The contract provided in pertinent part as follows:

1. *Employment.* The Company enters into this Agreement fully recognizing the value of the services of each Employee named herein, and said Company agrees to continue the employment of such Employees under the same general terms and conditions as have existed in the past and said Employees agree to perform the usual duties required of them in connection with the business of the Company.

2. *Compensation.* The Company shall pay to each Employee as his annual compensation (a) a fixed annual salary payable in equal monthly installments, in such amount as the Board of Directors of the Company shall determine from time to time, and (b) a percentage of the "undistributed net profits" of the Company for the Computation Year. "Computation Year", as used herein, shall mean a year ending on the May 30 prior to the June 30 marking the end of the fiscal year. The percentage of undistributed net profits to which each Employee shall be entitled is as follows:

| Name of employee | Percentage |
|---|---|
| Elgin B. Robertson, Jr. | 18.29 |
| Paul S. Neblett | 18.28 |
| Chester M. Davis | 18.28 |
| George B. LaLonde | 15.05 |
| Max C. Jordan | 15.05 |
| E. L. Snyder | 15.05 |

The "undistributed net profits" of the corporation are determined by deducting from the undistributed taxable income all compensation, including bonuses, payable to employees and premiums paid during the year on life insurance policies covering the lives of its officers, directors, or employees.

On May 5, 1965, the corporation established a profit-sharing plan and trust (plan). The plan provided that on the annual anniversary date each participant was entitled to one unit for each $100 of annual compensation in excess of $4,800 paid to him or accruing to him during the year for which the contribution was made. The value of each unit under the plan was to be determined by dividing the employer's contributions and the forfeitures by the total number of all participants. Each participant's account was then to be computed by multiplying the unit value by the number of his units. The maximum permissible employer contribution, including forfeitures, to be allocated to the account of any participant was 9⅜ percent of such participant's annual compensation in excess of $4,800 for the year. The plan defined

"annual compensation" as "the regular salary or commission of a participant, exclusive of all special payments of every nature."

In the case of shareholder-employee participants, the allocations to the participants' accounts were made upon the bases of the total of the fixed annual salary of each and his respective share of undistributed net profits as defined in the profit-sharing employment contract. Allocations to the other participants were based solely upon the annual salary of each. The number of units each participant was entitled to and the amounts from which his units were derived for the fiscal year ended June 30, 1967, were as follows:

| Employee | Annual salary | Share of undistributed net profits | Units |
|---|---|---|---|
| *Shareholders* | | | |
| Elgin B. Robertson, Jr. | $17,017.99 | $32,910.02 | 451 |
| Paul S. Neblett | 17,000.00 | 32,910.02 | 451 |
| Chester M. Davis | 17,000.00 | 32,910.02 | 451 |
| George B. LaLonde | 14,016.00 | 27,094.95 | 363 |
| Max C. Jordan | 14,016.00 | 27,094.95 | 363 |
| E. L. Snyder | 14,016.00 | 27,094.95 | 363 |
| *Nonshareholders* | | | |
| Ronnie G. Smith | 10,980.00 | | 62 |
| W. S. Walters | 7,800.00 | | 30 |
| Jim D. Humphrey | 6,775.00 | | 20 |
| Louise G. Winerich | 5,565.00 | | 8 |
| Eddie L. Stimson | 5,125.00 | | 3 |
| James H. Clay | 5,085.00 | | 3 |
| Shirley Wright | 4,930.00 | | 1 |

The positions held and duties performed by the shareholder-employees, who were full-time employees of the corporation during the fiscal year ended June 30, 1967, were as follows: Elgin B. Robertson, Jr., was the secretary-treasurer and was involved in outside sales in Dallas; Paul S. Neblett was vice president and general manager of the corporation at Dallas; Chester M. Davis was vice president and manager of outside sales in Houston; George B. LaLonde was an outside salesman who directed the industrial sales effort in Dallas; Max C. Jordan was an outside salesman directing the electronics sales effort in Dallas; and E. L. Snyder was an outside salesman in Houston. Outside sales positions comparable to that held by E. L. Snyder were occupied by three nonshareholder employees of the corporation. Contributions and allocations made under the profit-sharing plan had been made on the same basis in years prior to the corporation's fiscal year ended June 30, 1967. The minutes of the corporation's annual board of directors meetings held in July 1965, July 1966, and July 1967, reflect that the salaries of all officers except Gilbert Robertson, Sr., and Elgin Robertson, Jr., were to remain the same as in the preceding year.

The employer contribution to the fund and the allocation to the

participants' accounts for the fiscal year ended June 30, 1967, and the amounts vested and forfeitable were as follows:

| Name | Vested | Forfeitable |
|---|---|---|
| Elgin B. Robertson, Jr | $2, 527. 99 | $1, 685. 32 |
| Paul S. Neblett | 2, 527. 99 | 1, 685. 32 |
| Chester M. Davis | 2, 527. 99 | 1, 685. 33 |
| George B. LaLonde | 2, 034. 72 | 1, 356. 48 |
| Max C. Jordan | 2, 034. 72 | 1, 356. 48 |
| E. L. Snyder | 2, 034. 72 | 1, 356. 48 |
| W. S. Walters | 168. 16 | 112. 10 |
| Ronnie G. Smith | 115. 84 | 463. 38 |
| Jim D. Humphrey | 74. 74 | 112. 10 |
| Louise G. Winerich | 44. 84 | 29. 90 |
| James H. Clay | 16. 82 | 11. 21 |
| Eddie Lee Stimson | 5. 60 | 22. 43 |
| Shirley Wright | 1. 87 | 7. 47 |
| Total | 14, 116. 00 | 9, 884. 00 |

The corporation claimed a deduction in the amount of $24,000 in its U.S. corporation income tax return, taxable year ended June 30, 1967, for its contribution made to the profit-sharing plan. In his statutory notice of deficiency the Commissioner disallowed as a deduction the portion of the corporation's contribution which was forfeitable thus increasing its taxable income in that amount and taxing to the shareholders their respective shares of the deduction disallowed. The Commissioner also increased the gross income of each petitioner in the amount of the respective vested portions of the employer's contribution. The Commissioner explained the adjustments as follows: "that in operation, the basic compensation used in allocating contributions to the Elgin B. Robertson, Inc. Profit Sharing Plan and Trust included undistributed net profits payable to shareholder-employees which did not constitute compensation and was not otherwise consistently and uniformly available to all participants and therefore resulted in discrimination in allocation of benefits in favor of highly paid shareholder-employees and the plan is not qualified."

The corporation's largest account during its fiscal year ended June 30, 1967, was Burndy of Texas, Inc. (Burndy), a manufacturer whom the corporation represented under an exclusive sales contract since 1928 in Texas and in parts of Louisiana. Burndy was represented in electronics sales in Oklahoma by Penzner Associates, Inc. (Penzner). In June 1967, Robertson, Inc., and Penzner reached an agreement whereby Penzner was to terminate its representation of Burndy in Oklahoma and Robertson, Inc., was to expand its sales representation of the manufacturer in that State so as to be able to more nearly represent Burndy in a sales territory corresponding to the boundaries of

the electronics industry association, which included the States of Texas, Oklahoma, Arkansas, and Louisiana.

The following letter dated June 9, 1967, was sent to Penzner by Neblett, as vice president of Robertson, Inc., to confirm such oral agreement:

Mr. JERRY S. PENZNER
*Penzner Associates, Inc.*
*Box 4362*
*Overland Park, Kansas*

Subject: Oklahoma territory for Burndy electronic products.

DEAR JERRY:

This letter is to confirm the telephone conversation of June 2, 1967, between you and Max Jordan, in which we agreed to pay you $8,500.00. This money is to be your fee to consult with us in our taking over the responsibility for the sale of Burndy electronic products in Oklahoma, effective July 1, 1967.

For us to do an effective job in serving Burndy's customers in Oklahoma, we will need your customer correspondence file, your customer order file, and your customer mailing list and mailing list plates for Burndy electronic customers in the state of Oklahoma.

We hope that you can find the time to make at least one trip through the Oklahoma territory with our Glen Smith to introduce him to the customers you are now servicing in the Oklahoma territory.

Judd Clark tells me that you have notified him that we had come to an agreement about this change in territorial responsibility and he is issuing an addendum to the contract we now have with Burndy for the sale of electronic products to expand our territory coverage to include Oklahoma. I presume that he will also amend your contract with Burndy to delete your coverage in Oklahoma on Burndy electronics products.

Jerry, I am sending this letter in duplicate so you can sign one copy of it and return it to us for our files. I feel that we will both benefit from this agreement in the years to come and want to thank you for your cooperation in working out this exchange of territory responsibility.

Yours very truly,

ELGIN B. ROBERTSON, INC., *Repr.*
(S)    Paul S. Neblett
*Vice President.*
6/12/67
(S)    J. S. Penzner

The payment referred to in the letter was made by check dated June 9, 1967. In a cover letter enclosed with the returned confirmation letter bearing his signature, Jerry S. Penzner, president of Penzner, stated that he would leave the customer list in Oklahoma City on a Burndy demonstration unit. He added:

I would like to suggest that someone from your office come up here to Kansas City so that we might go over the customers with the available correspondence that is here in our office. I don't think this should take more than a day.

I will certainly do everything possible to make a trip through the area.

Effective on July 1, 1967, the exclusive sales agency contract between Robertson, Inc., and Burndy was amended so as to provide that the territory served by Robertson, Inc., was to include the electronics business in the State of Oklahoma and was terminable at will by either of the parties upon 30 days' written notice.

The corporation claimed a business expense deduction for the payment of $8,500 made to Penzner as a consulting fee during the taxable year ended June 30, 1967. The respondent in his statutory notice of deficiency disallowed the deduction with the explanation that the petitioner had not established that the amount constituted an ordinary and necessary business expense.

## OPINION

The first issue presented to us for decision is whether the profit-sharing plan of the petitioners' electing small business corporation constitutes a qualified plan for purposes of section 401(a). The respondent contends that the plan does not qualify under section 401 (a)(4) [3] because the employer contributions discriminate in favor of the shareholder-employees because allocations to their accounts were based upon undistributed net profits of the corporation in addition to their salaries. It is the respondent's position that the shareholders' division of the net profits of the corporation represented the distribution of dividends rather than compensation. Basing the allocation upon dividends, argues respondent, discriminates against employees who are not shareholders. Petitioners contend that their shares of the undistributed net profits were paid to them by reason of their employment relationship with the corporation rather than as a result of the shareholder relationship so that their allocations of employer contributions were based upon "annual compensation" as opposed to dividends.

In order for a profit-sharing trust to qualify under section 401(a), "the contributions or benefits provided under the plan do [may] not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees." Sec. 401(a)(4).

---

[3] SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

\*        \*        \*        \*        \*        \*        \*

(4) if the contributions or benefits provided under the plan do not discriminate in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or highly compensated employees.

Section 401(a)(5) provides, however, that a plan shall not be considered discriminatory "merely because the contributions or benefits of or on behalf of the employees under the plan bear a uniform relationship to the total compensation, or the basic or regular rate of compensation, of such employees." The plan must be neither discriminatory on its face nor in its operation. *Armanco Productions, Inc.*, 49 T.C. 174, 179 (1967); *Ed & Jim Fleitz, Inc.*, 50 T.C. 384 (1968). Sec. 1.401–1(b)(3), Income Tax Regs. Our determination of whether the plan before us is, in effect, discriminatory in favor of the shareholders is factual, thereby necessitating our examination of all the facts and circumstances surrounding the operation of this plan in the light of the expressed congressional purpose of preventing the use of such plans as a means of tax avoidance by the prohibited group. H. Rept. No. 2333, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 413.

The threshold question which must be resolved is whether the amounts received by petitioners as their share of the undistributed net profits of the corporation constituted compensation for purposes of section 401(a)(5). The petitioners do not urge that their share of the net profits represented "commissions" for purposes of the plan. In relying upon section 1.162–7(b)(2), Income Tax Regs., the petitioners point out that the percentage payments were made to the employees pursuant to an arm's-length agreement executed between themselves and the corporation prior to their rendering services and based upon their training, experience, length of service, and knowledge of the various territories in which the corporation operated. Petitioners did not, however, describe the work performed by the shareholders, their prior training, the amount of commissions earned by them, the amount of time devoted to the business, the number of customers serviced or territory covered by them, or other factors to support their assertion that sharing the undistributed net profits represented compensation.

The only evidence presented by petitioners was a list containing the names and positions of all the employees in the corporation and a very skimpy description of several of the shareholder-employee's duties. Based upon the evidence presented, it appears that at least three nonshareholder employees occupied positions comparable to those held by one of the shareholders (E. L. Snyder) but were not compensated by means of a percentage share of the net profits of the corporation.

The employment contract contained only the bare recital that the percentage of net profits payable to the employees was to comprise a portion of his "annual compensation." However, we cannot attach much significance to the label "compensation" as it relates to the corporation because it is unimportant to a subchapter S corporation and

its shareholder-employees whether payments to them represent salary or dividends. *Bramlette Building Corp.* v. *Commissioner*, 424 F. 2d 751 (C.A. 5, 1970), affirming 52 T.C. 200 (1969). The shareholders are taxable on either. More importantly, the employment contract required that all compensation, including bonuses, was to be deducted from undistributed taxable income (in years in which a subchapter S election was in effect) in computing the "undistributed net profits" to be distributed to the shareholder-employees. The contract was, therefore, self-contradictory by defining as a portion of "annual compensation" the shareholder's percentage of the net profits and yet also providing that all compensation was to be deducted from the undistributed taxable income in computing "undistributed net profits." Depending upon whether or not deductions on the premiums paid on individual life insurance policies covering the lives of officers, directors, or employees of the corporation—which amounts were also to be deducted from undistributed taxable income—were allowable under section 264, the "undistributed net profits" were otherwise equivalent to its undistributed taxable income as a subchapter S corporation. The undistributed taxable income was taxable to the shareholders in any event even though no distributions were made. Sec. 1.1373-1(e), Income Tax Regs.

Moreover, it is obvious that this corporation could not enter into such an employment contract with nonshareholders because 100 percent of the net profits were already siphoned off to the shareholder-employees by use of the employment contract. We, therefore, conclude that the petitioners' respective shares of the undistributed net profits of the corporation did not constitute compensation for purposes of section 401(a).

The profit-sharing plan before us is not on its face discriminatory with respect to the allocation of employer contributions. The plan provides that each participant is entitled to one unit of contributions for each $100 of annual compensation paid him or accrued for him in excess of $4,800. The prohibited discrimination exists by reason of the operation of the plan. While the plan provides for allocations to be made on the basis of a percentage of annual compensation, defined in the plan as "the regular salary or commission of a participant, exclusive of all special payments of every nature," the actual allocations herein have been based upon regular salary *plus* a share of the corporation's undistributed taxable income (which we have found not to be compensation) in the case of the shareholder-employees participants and upon salary alone in the case of the remaining nonshareholder participants.

Respondent's determination must, therefore, be sustained.

The second issue involves the deduction under section 162 as an ordinary and necessary business expense of the amount of $8,500 which was paid by the corporation to Penzner Associates when the corporation replaced Penzner as the exclusive sales agent for Burndy in marketing electronics equipment in Oklahoma. Petitioners assert that the payment was in the nature of a consultant's fee paid to Penzner for introducing Robertson, Inc., to the customers in the Oklahoma market area and for acquainting it with the products being manufactured in that area. Respondent contends that the payment was for the purchase of customer lists and the right to represent Burndy in Oklahoma, both of which are intangible capital assets the acquisition of which is a nonductible capital expenditure under section 263.

We agree with respondent on this issue. Petitioners have not met their burden of proving that the expenditure was made for consultation services provided by Penzner relating to Robertson, Inc.'s replacement of Penzner in Oklahoma. On the contrary, the evidence presented by petitioners clearly indicates that the payment was made for two purposes: (1) To acquire the customer mailing list, the customer correspondence file, the customer order file, and the customer mailing list plates held by Penzner; and (2) to obtain the right to represent Burndy in Oklahoma by securing the relinquishment of Penzner's exclusive sales agency in that State. As to the customer mailing list and related items, there is no doubt that these materials are capital assets. *Aaron Michaels*, 12 T.C. 17, 19 (1949). Petitioners have shown that Robertson, Inc., lost only one customer in Oklahoma in 1971, and the loss was caused by Burndy. We have consistently held that an asset which has a value in the taxpayer's business for a period greater than 1 year is a capital asset, the total cost of which is a capital expenditure rather than a deductible business expense. *Manhattan Co. of Virginia, Inc.*, 50 T.C. 78, 86 (1968). See *Richard M. Boe*, 35 T.C. 720, 725 (1961), and cases cited therein, affd. 307 F. 2d 339 (C.A. 9, 1962). There was no showing of the useful life of the asset.

Purchasing the right to represent Burndy in Oklahoma constituted an expenditure made in the acquisition of business which was also of a capital nature. *Carl Reimers Co.*, 19 T.C. 1235, 1239 (1953), affd. 211 F. 2d 66 (C.A. 2, 1954). Robertson, Inc., obtained the release of Penzner's contract rights and also acquired an expanded sales agency agreement with Burndy, the costs of which represent capital expenditures. The business acquired was that of an exclusive sales agency for electronics products of Burndy in Oklahoma. See *Falstaff Beer, Inc.*, 37 T.C. 451, 460 (1961), affd. 322 F. 2d 744 (C.A. 5, 1963).

The correspondence exchanged between Robertson, Inc., and Penzner supports the conclusion that the payment was made for customer

lists and the right to represent Burndy. Consultation and introduction of Oklahoma customers were not part of the agreement. In a letter written to Jerry S. Penzner, the president of Penzner, Paul Neblett indicated that Robertson, Inc., would need Penzner's customer correspondence file, order file, mailing list, and mailing list plates covering the Burndy customers in the State of Oklahoma. The letter did not specify the nature of any consultation which was to be extended the successor representative and merely expressed the "hope that [Jerry Penzner] can find the time to make at least one trip through the Oklahoma territory with our Glen Smith to introduce him to the customers you are now servicing in the Oklahoma territory." Penzner's response that he would "certainly do everything possible to make a trip through the area" makes it obvious that the introduction of Robertson, Inc., to Oklahoma customers was not one of the items for which Robertson, Inc., paid $8,500. Moreover, it was at *Penzner's suggestion* that a Robertson representative meet with Penzner's Kansas City officials in order that the customer correspondence file could be inspected. To the extent that 1 day's activity could in any way be termed "consultation," the Penzner suggestion was nothing more than a gratuitous gesture on Penzner's part and only incidental to the sale of its customer lists and exclusive agency to Robertson, Inc.

The $8,500 expenditure to Penzner is clearly not deductible as a business expense.

*Decisions will be entered for the respondent.*