RODEWAY INNS OF AMERICA, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8311-72.     Filed December 24, 1974.

*William L. Raby,* for the petitioner.
*Harry Beckhoff,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined a deficiency of $43,094.22 in the petitioner's 1968 Federal income tax. The issue to be decided is whether a payment made as consideration

for canceling certain exclusive rights constituted a business expense under section 162(a) of the Internal Revenue Code of 1954 [1] or whether it was a capital expenditure under section 263(a) and amortizable under section 167(a).

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Rodeway Inns of America (Rodeway), is an Arizona corporation, which had its principal office at Dallas, Tex., at the time of filing its petition herein. Rodeway computes its income on a calendar year and uses the accrual method of accounting. Rodeway filed a consolidated corporate Federal income tax return for the year 1968 with the Western Service Center, Ogden, Utah.

Rodeway was in the business of operating a chain of motor hotels during 1968. In order to develop such chain, it made various "Territorial Agreements." On July 1, 1964, Rodeway entered into a Territorial Agreement with Rodeway Inns of the Southwest (RIS), an unrelated corporation. By virtue of the agreement, RIS obtained the exclusive right to construct or cause to be constructed Rodeway motels within the States of California, Arizona, New Mexico, Colorado, and the city of El Paso, Tex., subject to the terms of the agreement.

RIS agreed to obtain sites which were to be approved by Rodeway for the construction of motor hotels and to construct, or cause to be constructed, motor hotels at such sites. The number of sites to be so obtained was specified. RIS was to pay Rodeway $7,500 for each approved site and 15 cents per day for each motel unit constructed during the original and first renewal term of the territorial agreement; thereafter, Rodeway was to be paid the same amounts as were being paid by other franchisees. Upon granting approval of a site offered by RIS and receiving the initial franchise fee of $7,500 (or such other amount as applicable), Rodeway was obligated to execute and deliver to RIS, or to a licensee selected by RIS, a franchise agreement for the site.

The territorial agreement provided for its expiration on June 30, 1966, unless previously terminated or renewed. RIS had the

---

[1] All statutory references are to the Internal Revenue Code of 1954.

right to cancel the agreement at any time by giving 90 days' written notice to Rodeway. Rodeway could cancel the agreement by giving 90 days' written notice to RIS in the event RIS breached or failed to perform under the agreement, but Rodeway had no right to cancel the agreement for any cause other than the failure of RIS to comply with its construction and site approval requirements so long as RIS was substantially performing all other provisions of the agreement and was diligently prosecuting the correction of the default described in Rodeway's notice. In addition, the agreement obligated Rodeway not to unreasonably withhold its approval of sites selected by RIS. If RIS fulfilled the construction and site quotas, it was given options to renew the agreement at 2-year intervals. The agreement could be extended until July 1, 1994.

In the event Rodeway received from another person a bona fide offer of a site for the construction of a Rodeway motel, or for the purchase of a franchise for the operation of a Rodeway motel, within RIS's territory, and certain other conditions were met, Rodeway was to give RIS notice of such offer. RIS then had 60 days during which to secure such site or a comparable site and obtain approval for it. If RIS failed to follow such procedure, Rodeway was given the opportunity to make other arrangements for construction of a motel on the site. On several occasions, at Rodeway's request, RIS waived its right to develop sites within its territory and allowed Rodeway to make arrangements with others for development of such sites. As consideration for its waiver, RIS required that the motels thereby built be credited toward its quotas. The credits thus obtained enabled RIS to meet the quotas.

RIS had the right to assign or transfer the territorial agreement or any portion or rights thereunder, including the right to make subterritorial agreements. At one point during the life of the agreement, RIS did transfer some of its rights under the agreement to Leonard M. Goldman. RIS could not itself issue a franchise for a Rodeway motel in its territory. RIS was not entitled to receive any portion of the franchise fees due Rodeway from its agreements with other motel operators in RIS's territory.

On May 10, 1965, Rodeway and RIS executed an amendment to the territorial agreement whereby RIS's rights to a portion of the territory were terminated in consideration of $15,000 which

Rodeway paid RIS. RIS agreed that Rodeway had the exclusive and sole right to construct its motels in the territory surrendered. The quotas for construction and site approval in the remaining territory were reduced.

On August 30, 1968, Rodeway, RIS, and Mr. Goldman executed a cancellation agreement. In consideration of $100,000 which Rodeway paid to RIS and Mr. Goldman and the delivery to them of options to purchase 132 shares of Rodeway's common capital stock, RIS and Mr. Goldman released "all of their Franchisee's rights and privileges" under the territorial agreement. The options had no ascertainable fair market value at the time they were granted. By that time, RIS had exercised its option to renew for the second 2-year renewal period (July 1, 1968, through June 30, 1970) and was performing within the terms and provisions of the territorial agreement.

Rodeway canceled the territorial agreement because it believed that it could develop the territory more effectively than could RIS. Rodeway considered that RIS was not developing the territory as rapidly as was necessary for Rodeway to maintain its competitive position in the burgeoning motel industry. Without such development by Rodeway, the existence of a Rodeway chain of motels was threatened by the rapid expansion of similar chains. Choice motel locations in RIS's territory were rapidly disappearing in 1968. At that time, it appeared that all the choice sites in the RIS territory were likely to be taken within the succeeding 5 years. Rodeway also believed that canceling the agreement would enhance the value of its motels and yield greater profits from its operations in the long run.

Rodeway was unable unilaterally to terminate the territorial agreement since RIS was meeting its quotas and was otherwise performing its obligations under the agreement. The only way Rodeway could eliminate RIS's rights in its territory was to purchase those rights. After the cancellation of the agreement, Rodeway did not grant to any other parties the exclusive right to develop RIS's territory but has continued to market and grant its own franchises within the territory.

On its Federal income tax return for the year 1968, the petitioner deducted as a business expense the $100,000 it paid RIS and Mr. Goldman to terminate their rights under the territorial agreement. In his notice of deficiency, the Commissioner determined that the payment to RIS and Mr.

Goldman was a capital expenditure and not subject to amortization. The petitioner has agreed to certain other adjustments made by the Commissioner in his notice of deficiency.

## OPINION

Section 162(a) provides in part:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

On the other hand, section 263(a) states in part:

(a) GENERAL RULE.—No deduction shall be allowed for—
(1) Any amount paid out * * * for permanent improvements or betterments made to increase the value of any property or estate. * * *

The main problem to be considered is whether Rodeway's payment to RIS and Mr. Goldman was an "expense" as used in section 162(a) or whether it was capital in nature within the meaning of section 263(a). Should we conclude that the payment is capital in nature, we must then decide whether it may be amortized under section 167.

There have been a host of cases requiring the Court to distinguish between an expense and a capital expenditure; a recent one was *Elgin B. Robertson, Jr.,* 61 T.C. 727 (1974). In that case, Robertson represented Burndy, a manufacturer of electronics products, under an exclusive sales contract in Texas and part of Louisiana. Penzner represented Burndy under a similar arrangement in Oklahoma. Penzner and Robertson reached an agreement whereby Penzner terminated its representation of Burndy in Oklahoma and Robertson expanded its representation of Burndy into the vacated territory. The controversy concerned the tax treatment of the payment which Robertson made to Penzner for its customer lists and its rights in Oklahoma. The Court held that the payment constituted a capital expenditure because, in part, it was made to acquire a new business, representing Burndy in Oklahoma.

The payment made by the petitioner to secure a cancellation of the territorial agreement resembles in essence the payment made by Robertson to secure the right to do business in Oklahoma. While the territorial agreement was in effect, RIS and its assignee, Mr. Goldman, possessed valuable rights to carry on a

business in the area covered by that agreement. They had the opportunity to construct motels and to operate them for a profit or to derive income by licensing them to others. Their right to conduct that business was transferable, and the business could be carried on for as long as 30 years. Considered from the other side, the territorial agreement, so long as it existed, significantly restricted Rodeway's rights in the territory. Rodeway could not construct a motel, and could not grant a franchise to someone else to do so, without the approval of RIS. If Rodeway became aware of a most advantageous opportunity, it could not act without the concurrence of RIS, and to secure RIS's approval, Rodeway was apt to have to pay a price—to make some concession to RIS.

By the cancellation agreement, RIS's rights were extinguished, and Rodeway acquired the untrammeled right to do business in the territory. Without the necessity of any additional payments to RIS or any concessions to it, Rodeway could, after the cancellation of the territorial agreement, build as many motels as it wished or grant whatever franchises it desired to other persons to construct motels. By making the payment, it was free to enhance its income not just for the year 1968, but for whatever period remained during which it might still secure desirable sites for new motels.

A payment to acquire a business is in the nature of a capital expenditure. *Elgin B. Robertson, Jr., supra.* By its payment, Rodeway enhanced its business opportunities in the Southwest area and obtained the chances of increased income from that territory, and payments made for such reasons are capital in nature. *Darlington-Hartsville Coca-Cola Bot. Co. v. United States,* 393 F. 2d 494 (C.A. 4, 1968), certiorari denied 393 U.S. 962 (1968); *Darrell D. Hudgins,* 55 T.C. 534 (1970); *Bay Counties Title Guaranty Co.,* 34 T.C. 29 (1960), affirmed per curiam 288 F. 2d 187 (C.A. 9, 1961); see *KWTX Broadcasting Co.,* 31 T.C. 952 (1959), affirmed per curiam 272 F. 2d 406 (C.A. 5, 1959); cf. *Medco Products Co.,* 62 T.C. 509 (1974). Thus, the payment by Rodeway was not merely to maintain its existing business. See *Houston Natural Gas Corp. v. Commissioner,* 90 F. 2d 814 (C.A. 4, 1937), affirming 34 B.T.A. 228 (1936), certiorari denied 302 U.S. 722 (1937); *Falstaff Beer, Inc.,* 37 T.C. 451 (1961), affd. 322 F. 2d 744 (C.A. 5, 1963); see also *Philad Co. of Delaware,* 47 B.T.A. 565 (1942); compare *Booth Newspapers, Inc. v. United States,* 303 F. 2d 916 (Ct. Cl. 1962); *Cubbedge*

*Snow,* 31 T.C. 585 (1958); *Fishing Tackle Products Co.,* 27 T.C. 638 (1957). As required by section 441, Rodeway filed annual tax returns and computed its income on an annual basis; the payment in 1968 to secure the cancellation of the territorial agreement was not related merely to the production of income for that year. *Darrell D. Hudgins, supra.* To deduct the full amount of that payment against income for the one year would cause a gross distortion of income. *Commissioner v. Boylston Market Assn.,* 131 F. 2d 966 (C.A. 1, 1942), affirming a Memorandum Opinion of this Court.

When a lessor of real property makes a payment to a lessee to terminate the lessee's lease prior to its expiration, such payment is treated as a capital expenditure. *Peerless Weighing & Vending Machine Corp.,* 52 T.C. 850 (1969); *Trustee Corp.,* 42 T.C. 482 (1964). The similarities between such situation and the one involved herein provide additional support for concluding that Rodeway's payment constituted a capital expenditure. In both situations—there is an agreement under which rights are granted for a specified period in return for consideration to be paid over that period; the agreement is cancelled and the rights are terminated prematurely in consideration for a payment by the grantor to the grantee; and after the termination, the grantor is restored to the rights possessed by him prior to the agreement. Though the one agreement concerned real estate and the present agreement concerns intangible rights, there is no reason for a different tax treatment of the payment to secure the cancellation. *Philad Co. of Delaware, supra.*

The petitioner maintained that Rodeway's payment constituted a business expense for the reasons that: (1) Rodeway did not acquire a capital asset by virtue of making the payment, and (2) the payment was made to be released from a burdensome or onerous contract. In the first of these arguments, the petitioner would exhort form over substance; it argues that it did not secure an asset because it did not secure some tangible thing which it had not previously possessed. Yet, it did obtain the right to do business in the Southwest area in any manner that it desired and without any interference on the part of RIS. That right, whether or not signified by a tangible thing, was of considerable value to it, and Rodeway stood to enhance its profits over a period of years. The fact that it was merely reacquiring rights once possessed by it is no reason for treating it any

differently than the initial purchase of a business. *Triangle Publications, Inc.,* 54 T.C. 138 (1970). *Harry M. Flower,* 61 T.C. 140 (1973), and *Marc D. Leh,* 27 T.C. 892 (1957), affd. 260 F. 2d 489 (C.A. 9, 1958), cases relied upon by the petitioner, both involved the tax treatment of the recipient of the payment, and not the treatment of the payor; neither case is inconsistent with our conclusion in this case.

In support of the second of those arguments, the petitioner relies upon *Helvering v. Community Bond & Mortgage Corp.,* 74 F. 2d 727 (C.A. 2, 1935), affirming 27 B.T.A. 480 (1932); *Pressed Steel Car Co.,* 20 T.C. 198 (1953); *Olympia Harbor Lumber Co.,* 30 B.T.A. 114 (1934), affd. 79 F. 2d 394 (C.A. 9, 1935). However, in those cases, the taxpayer made a payment to reduce or eliminate its losses or expenses; whereas, in the present case, Rodeway paid to have the territorial agreement canceled so as to have the opportunity to augment its income from the territory. See *H & G Industries, Inc.,* 60 T.C. 163 (1973), affd. 495 F. 2d 653 (C.A. 3, 1974).

In our judgment, Rodeway's payment for the cancellation of the territorial agreement was a capital expenditure since Rodeway thereby acquired the right to conduct a business from which it could anticipate earning profits over future years, and we so hold. In view of that holding, we then reach the question of whether such payment may be amortized under section 167(a). That section provides:

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
    (1) of property used in the trade or business, or
    (2) of property held for the production of income.

The cost of acquiring an intangible asset, such as that acquired by Rodeway, may be amortized under section 167(a) but only if it has a useful life "which can be estimated with reasonable accuracy." Sec. 1.167(a)-3, Income Tax Regs.; *Manhattan Co. of Virginia, Inc.,* 50 T.C. 78 (1968). "Useful life" is defined in section 1.167(a)-1(b), Income Tax Regs., as "the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income." The petitioner must demonstrate with "reasonable certainty" or "reasonable accuracy" the period beyond which the

agreement would not have continued. *Gulf Television Corp.,* 52 T.C. 1038, 1057 (1969).

The Commissioner argued that Rodeway's payment produced an economic benefit extending into the indefinite future since it thereby acquired the unrestricted opportunity to develop RIS's territory for as long as it chose to do so. Nevertheless, when a lessor makes a capital expenditure in order to terminate a lease prematurely, such expenditure is amortizable over the remaining period of the canceled lease, although the lessor thereby reacquires the right to deal with the property as he wishes for so long as he wishes. *Peerless Weighing & Vending Machine Corp.,* 52 T.C. 850 (1969); *Trustee Corp.,* 42 T.C. 482 (1964). Such cases hold that the payment is made to obtain possession of property for the duration of the lease, and that the payment thus is amortizable over that period. *Henry B. Miller,* 10 B.T.A. 383 (1928). In substance, Rodeway's payment for the cancellation of the territorial agreement achieved the same results, and it is therefore amortizable over the remaining useful life of that agreement. See also *Triangle Publications, Inc.,* 54 T.C. 138 (1970).

The territorial agreement could have continued in force for as long as 24 years and 22 months after the date on which it was canceled, when it would have expired by its own terms, or for merely 22 months longer, when it was next subject to renewal. However, such provisions are not controlling for the purposes of determining the useful life of the agreement; we must determine how long the agreement would have been useful to Rodeway, had it not been canceled. Sec. 1.167(a)-1(b), Income Tax Regs.; see *KWTX Broadcasting Co.,* 31 T.C. 952 (1959).

Initially, the petitioner argued for the 22-month useful life. However, RIS had the option to renew so long as it was fulfilling its obligations under the territorial agreement, and in computing the useful life of the asset, such option for renewal must be taken into consideration. *Toledo TV Cable Co.,* 55 T.C. 1107 (1971), affirmed per curiam 483 F. 2d 1398 (C.A. 9, 1973). Nor are we convinced by the Commissioner's argument that the useful life of the territorial agreement would extend for the entire period during which it could be renewed, for that argument assumes that the agreement would remain useful throughout that period.

Rodeway produced evidence that all the desirable locations in the area covered by the territorial agreement would, most likely,

be taken within 4 or 5 years after 1968, and the Commissioner accepted that conclusion. Thus, the parties agree that, viewed from 1968, the usefulness of the territorial agreement would be consumed by the end of 1973. Based on that evidence, we find and hold that the useful life of the territorial agreement was 5 years, determined as of 1968, and that the petitioner may amortize the cost of canceling that agreement over such period.

*Decision will be entered under Rule 155.*