North Shore Bus Company, Inc. v. Commissioner.
North Shore Bus Co. v. Commissioner
Docket No. 108391.
United States Tax Court
1943 Tax Ct. Memo LEXIS 490; 1 T.C.M. (CCH) 493; T.C.M. (RIA) 43041; January 27, 1943
*490 Jacob I. Goodstein, Esq., 21 E. 40th St., New York City, for the petitioner. Conway Kitchen, Esq., for the respondent. SMITH Memorandum Opinion SMITH, Judge: This proceeding is for the redetermination ofdeficiencies in income tax for 1936 and 1937 of $22,741.81 and $5,739.53, respectively. The petitioner alleges that the respondent erred in the determination of the deficiency for 1936: (1) by including in petitioner's gross income $24,000 as the profit on an alleged sale of passenger buses; (2) by disallowing a deduction from gross income of $15,980.97 representing a part of the New York City emergency tax accrued on petitioner's books; (3) by disallowing the deduction of $37,812.09 representing part of the petitioner's cost of an original franchise terminated by the City of New York in 1936; (4) by failing to eliminate from taxable income interest received on City of New York corporate stocks in the amount of $1,080; and (5) by disallowing the deduction of $394.71 representing 1936 liability to the City of New York for tax on charter hire and special revenue from October 20, 1936, to December 31, 1936. The petitioner alleges that the respondent erred in the determination *491 of the deficiency for 1937 by: (6) failing to eliminate from taxable income interest received on City of New York corporate stocks in the amount of $1,080; and (7) by refusing to allow the deduction of $4,806.41 representing 1937 liability to the City of New York for tax on charter hire and special revenue. The respondent concedes issues (5) and (7). The petitioner is a corporation organized under the laws of the State of New York with its principal office at Central Terminal Building, Flushing, Long Island. It filed its Federal income tax returns for the calendar years 1936 and 1937, which were made upon the accrual basis, with the collector of internal revenue for the first district of New York. During the years 1936 and 1937 the petitioner was engaged in the operation of buses, some under franchises granted by the City of New York and some without franchise. For convenience the several issues will be treated separately. I. - Exchange of Property FACTS. - Pursuant to an Order Contract dated March 5, 1936, the petitioner purchased 10 Model 40-R twin motor coaches from the Twin Coach Corporation. The total purchase price was $118,964.80 payable $6,000 at the time of purchase *492 and the balance in 48 monthly installments of $2,353.43 each, the installments being evidenced by negotiable promissory notes bearing interest at the rate of six percent per annum. The Order Contract provided that the purchase was made under the "Terms and conditions as outlined F. R. Fageol memo 3-5-36," which is a memorandum to the corporation's sales department signed by F. R. Fageol, president of the Twin Coach Corporation. The memorandum reads in material part as follows: The writer made the following deal with Joe Rauchwerger today and accepted an order for 10 Model 40-R coaches on the following basis: 1. Price same as last order. 2. We are to take his 10 old Yellow parlor cars in at $30,000.00, $24,000.00 of which is to be used to pay off the Yellow Truck Company and the remaining $6,000.00 to be credited to Rauchwerger on the purchase of the 10 new jobs, balance in 48 months. 3. As additional collateral Rauchwerger is to include in the mortgage his 6 pusher type big Yellows. 4. We do not have to pay off the amount due Yellow except at the rate of $2,400.00 per month unless we sell the jobs during the interim. Pursuant to the aforesaid contract and prior to March 26, *493 1936, the Twin Coach Corporation paid the petitioner by check the sum of $24,000, which the petitioner deposited to its credit in its bank account. By check dated March 26, 1936, the petitioner paid to the Yellow Manufacturing Credit Corporation the sum of $23,960.99 which represented the unpaid balance then owed by it on the 10 old Yellow parlor cars. These old cars had a cost to the petitioner of $107,481.50 which it had entirely recovered through depreciation allowances in its income tax returns prior to 1936. The 10 new buses purchased in 1936 from the Twin Coach Corporation were taken in on petitioner's books of account at the full contract price of $118,954.80. Contemporaneously therewith the petitioner's depreciation reserve was credited in the amount of $30,000, the trade-in value of the old buses. This was in accordance with the requirements of the Transit Commission's uniform system of accounts, to which the petitioner is subject by law. The buses are being depreciated by the petitioner at the full contract price less $30,000. In the determination of the deficiency the respondent has held that the $24,000 which the petitioner received from the Twin Coach Corporation constituted *494 taxable income. He has adjusted depreciation allowances for the taxable years before us consistently therewith. OPINION. - The petitioner purchased property held for productive use in its business for property of a like kind to be held for productive use in that same business. The only question is whether it exchanged the old buses solely for new buses within the meaning and intendment of section 112 (b) (1) of the Revenue Act of 1936 so that its gain is not to be recognized. That section reads in material part as follows: SEC. 112. RECOGNITION OF GAIN OR LOSS * * * * *
(b) Exchanges Solely in Kind. - (1) Property Held For Productive Use or Investment. - No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment. The question is whether the petitioner exchanged its old buses "solely" *495 for property of a like kind within the contemplation of the statute. In explanation of this provision of the law the respondent has provided in article 112 (b)-1 of Regulations 94: No gain or loss is recognized if (1) a taxpayer exchanges property held for productive use in his trade or business, together with cash, for other property of like kind for the same use, such as a truck for a new truck or a passenger automobile for a new passenger automobile to be used for a like purpose. * * * The respondent points out that the petitioner received a check for $24,000 in the exchange and he has held that to the extent of that $24,000 the exchange was not solely for property (buses) to be used in business. But did the petitioner receive something more than buses in the exchange? Twin Coach Corporation was obviously not interested in the old buses except in connection with effecting the sale of the new buses. It agreed to give the petitioner an allowance of $30,000 on the old buses in connection with that sale. Twenty-four thousand dollars of this amount was merely advanced by Twin Coach Corporation for the express purpose of paying off the amounts still owed by the petitioner on the old *496 buses and thus clearing title to those buses so that Twin Coach Corporation could proceed to sell them to new parties. This did not put $24,000 in the petitioner's pocket and the petitioner did not thereby come out of the transaction with something in addition to the new buses. Cf. . The petitioner in accordance with its agreement whereby the exchange was made immediately became indebted to Twin Coach Corporation for $24,000, the approximate amount which it owed Yellow Manufacturing Credit Corporation. One debt was merely substituted for another. Eventually the petitioner had to pay the $24,000 to Twin Coach Corporation. The petitioner, when the transaction was completed, received nothing out of the exchange save new buses. It had to give in exchange for the new buses not only its entire interest in the old buses but, in addition, cash. While the payment of petitioner's obligation to Yellow Manufacturing Credit Corporation was effected by a cash payment to petitioners, nevertheless, its only effect was to substitute Twin Coach Corporation for Yellow Manufacturing Credit Corporation as the creditor to which the petitioner *497 owed $24,000. II. - New York City Emergency Tax Accrued and Deducted FACTS. - During the calendar year 1936 the petitioner accrued on its books of account and claimed as a deduction in its income tax return for that year $22,954.44 on account of the New York City emergency tax. At all times material herein the petitioner kept its books of account and filed its income tax returns on the accrual basis. The New York City emergency tax for 1936 was an excise tax amounting to three percent of the gross income derived during the year from operation of utilities within the territorial limits of New York City. Monthly returns of such gross income were required to be filed and the tax was due and payable at the time of filing the returns. A penalty of five percent of the tax was imposed for failure to file a required return or to pay the tax when due. The $22,954.44 represented a computation by the petitioner's accountant of the amount of the emergency tax due for 1936. An accountant from the comptroller's office of the City of New York made an examination of petitioner's books of account in 1937 for the purpose of computing the petitioner's emergency tax liability for the period November *498 1, 1935, to December 31, 1936. He determined that the total tax due for 1936 was $33,307.74 of which $8,045.67 had been paid and that there was a balance due of $25,262.07 plus interest and penalties of $4,337.52. On November 30, 1937, demand for payment of such deficiency, plus interest and penalty, was made by the City of New York. Thereafter there were several conferences between the petitioner's officers and the representatives of the comptroller's office relative to the adjustment and settlement of petitioner's tax liability for 1936 and prior years. The petitioner represented that its financial condition rendered it impossible for it to pay the full amount of the tax claimed to be due although it was not at the time insolvent. On December 23, 1938, the petitioner and the comptroller entered into a "Consent And Waiver" by which the petitioner agreed to pay, in full satisfaction of its deficiency in 1936 emergency tax liability, the principal amount of $6,559.45 plus penalty and interest of $414.02. Under the settlement agreement the petitioner was to pay $1,000 within five days and $1,500 monthly thereafter until the entire amount was paid. The petitioner reported in its return *499 for 1936 the difference between the amount of the tax accrued in 1936 and the amount of the deficiency which it finally agreed to pay for that year. Of the $22,954.44 claimed as a deduction from gross income on the petitioner's income tax return for 1936 the respondent allowed the deduction of $6,973.47, representing the amount of tax and penalties which petitioner agreed to pay under the consent and waiver agreement of December 23, 1938, and disallowed the deduction of $15,980.97. OPINION. - The question presented is whether the petitioner is entitled to deduct from its gross income for 1936 the full amount of the city emergency tax which it showed as an accrual on its books of account for 1936 or only the amount which that liability was compromised in 1938. The petitioner contends that its return for 1936 was properly made in accordance with its books of account and that its tax liability for that year was not affected by the compromise of the city emergency tax made in 1938. The respondent's argument is that since the year 1936 is open for adjustment the amount of tax finally paid under the compromise agreement of 1938 should be substituted for the amount accrued upon the petitioner's *500 books of account in 1936 and the excess accrual eliminated. In making this contention he cites . In that case the taxpayer deducted in its return for 1934 the amount charged and paid in that year for electric current. In 1939, as the result of a court ruling, it received a refund of a portion of the amount paid. The Board held that since the year 1934 was still open the amount refunded in 1939 should be restored to 1934 income. It was pointed out in the Board's opinion in , however, that a valid distinction existed between the case and cases like , affirming , where it was held that the difference between an amount which the taxpayer paid in 1932 in settlement of a liability for personal property taxes for 1928, 1929, and 1930 and the amount which previously had been demanded and which the taxpayer had deducted in the prior years' returns constituted taxable income of 1932. With reference to that case the Board said in its opinion *501 in :
* * * It should be noted that the taxpayer had effected a compromise with the local tax officers while litigation was still pending in 1932. In other words, he drove a bargain while the judicial outcome was still in doubt and by this agreement made a saving. The fundamental premise of the bargain was that the validity of the tax was doubtful. In this light the compromise can be regarded only in the light of a new transaction taking place in 1932, which, instead of bearing a definite relation to the validity of the tax and its refund in case of invalidity, put those questions out of consideration altogether. There was no reason for relation back to the original deduction here and the court properly disregarded it. In the circumstances the Circuit Court treated the new transaction, divorced as it was from the original deduction or later possible refunds, as single in itself, and, since it resulted in a gain to the taxpayer in the year in which it was effected, taxed the gain when made. The facts here are much the same as those in , and bear the same *502 dissimilarity to those in the Elliott Company case upon which the Board relied in distinguishing it from the Central United National Bank case. Here the petitioner accrued on its books, the books being kept on the accrual basis, a valid tax obligation for 1936 and deducted the amount accrued in its income tax return for that year. In 1938 it entered into an agreement with the city taxing authorities by which its tax liability for 1936 was compromised for a much less amount than that previously accrued. While the evidence is not entirely clear as to the basis of the compromise there is no indication that it resulted merely from a recomputation of petitioner's correct tax liability. Petitioner's chief witness testified that the compromise resulted from petitioner's representations that it was not in financial condition to pay the full amount of the tax assessment. While petitioner's Federal income and excess profits tax return for 1937 shows a net operating loss for that year of $4,526.94 it also shows surplus and undivided profits at the end of the year of $149,543.35. The accountant from the city comptroller's office who made an examination of petitioner's books and accounts *503 in 1937 determined that petitioner's correct emergency tax liability for 1936 was $33,307.74, exclusive of interest and penalties of $4,337.52. There is no evidence before us petitioner ever questioned the correctness of this computation or that the amount determined by the accountant was not the correct amount of petitioner's 1936 emergency tax liability to the city. Petitioner does not make any claim in this proceeding for the accrual in 1936 of any greater amount than that claimed in its 1936 return, namely $22,954.44. We think that the evidence shows that at least this amount was properly accrued by the petitioner in 1936 and that petitioner is entitled to the deduction claimed. See ; ; ; . III. - Deduction in 1936 of Unamortized Costs of Franchises FACTS. - On January 28, *504 1935, the petitioner and the City of New York entered into a contract by which the petitioner was granted a franchise to operate its buses for hire over certain routes designated therein in the Borough of Queens. The franchise was subject to revocation by the city at any time upon 90 days' notice to the petitioner and in no event was the franchise to extend beyond December 31, 1938. On October 20, 1936, the City of New York entered into a new contract with the petitioner by which it was granted a franchise to operate its buses for hire on substantially the same routes as those granted under the contract of January 28, 1935. One of the routes under the earlier contract was taken from the petitioner by the later contract, but other routes were added. The total mileage covered by the new franchise was 50.2 miles whereas that covered by the earlier contract was for 39.5 miles. The franchise granted to the petitioner by the contract of October 20, 1936, was for a term of 10 years and it was not subject to revocation by the City of New York until after five years from the date thereof. The compensation payable to the City of New York by the petitioner under the contract of January 23, *505 1935, was 10 percent of the gross receipts from whatever source derived in connection with the operation of buses along the routes authorized by the contract. The compensation payable under the contract of October 20, 1936, was five percent of the gross receipts for the first two years; six percent of the gross receipts for the following three years., seven percent of the gross receipts for the last five years, said gross receipts being defined as including the gross revenues of the petitioner from whatever source derived either directly or indirectly in connection with the operation of buses. The rates of fare were the same under both franchises, namely, five cents for one continuous ride; both franchises specified that free transfers should be issued; and both franchises specified that monthly commutation tickets for school children should be sold for $1 each, except that routes Q-26 and Q-27 provided for zone fares. The cost to the petitioner of obtaining the franchise under the contract of January 28, 1935, was $46,985.65. The cost of obtaining the franchise under the contract of October 20, 1936, was $6,019.30, plus certain other expenses not charged to the cost of franchise *506 on the petitioner's books. On January 1, 1936, the unamortized cost to the petitioner of obtaining the franchise under the contract of January 28, 1935, as shown by its books of account, was $4,021.65, which amount was claimed as a deduction from gross income in petitioner's income tax return for 1936. The respondent determined, however, that the unamortized cost of the franchise at January 1, 1936, was $33,415.93. He further held that the petitioner was not entitled to a deduction of the full amount of such unamortized cost for 1936 but that the amount thereof plus the cost of the new franchise should be spread ratably over the life of the new franchise and only a proportionate part be deducted from the gross income of 1936. He determined that the correct amount allocable to 1936 was $3,209.56. Of the $41,021.65 amortization claimed on the return the respondent disallowed the deduction of $37,812.09. The City of New York never gave any notice to the petitioner for the cancellation of its contract of January 28, 1935. Section 55 of the contract dated October 20, 1936, reads: Section 55. The Company agrees that the contract dated January 28, 1935, by and between the Company and *507 the City, granting said Company a franchise to maintain and operate omnibuses on certain streets and avenues in the Borough of Queens, shall be surrendered to the City and shall be terminated and cancelled upon the granting by the Transit Commission of the certificates of convenience and necessity and permission and approval upon this contract, as required by Article IV of this contract. OPINION. - The question presented is whether the petitioner is entitled to deduct from gross income in its income tax return for 1936 the unamortized cost of its franchise granted January 28, 1935. It is the petitioner's contention that that franchise was cancelled in 1936 and that therefore the unamortized cost is a legal deduction from gross income as a loss sustained within the year. Although the petitioner was entitled to no preference over other applicants for the new contract we can not doubt that the petitioner received the new franchise by virtue of the fact that it was the owner of the old franchise which did not expire until December 31, 1938. From every standpoint it would appear that the new franchise was just as valuable to the petitioner as the old one. It had a much longer life and *508 the terms appear to have been more favorable to it. So far as the record shows the petitioner willingly agreed to the cancellation of the old contract for the new. In ; affirming (C.C.A., 2nd Cir.), , which had reversed , the taxpayer claimed a deduction for unamortized discount premiums and expenses paid in connection with the retirement of certain bonds, those bonds having been retired before maturity by exchanging a new issue of bonds at par plus a cash premium for them. The Supreme Court denied the claimed deduction and held that the unamortized expenses incurred in the issuance of the old bonds and the expenses of the exchange were both attributable to and should be treated as a part of the cost of obtaining the loan and should be prorated over the life of the bonds. The court said that the taxpayer merely "substituted a new obligation for the old." In , the taxpayer as lessee claimed a loss deduction for the unamortized cost of a lease *509 in the taxable year in which a new lease was executed at an increased rental. The Board denied the deduction and held that the unamortized cost of the old lease should be prorated over the life of the new lease. The Board said: * * * While the unextinguished cost of the old lease might have been a loss had the lease been canceled before expiration if no new lease had been executed, viewing the entire transaction we believe there was such a continuity of rights and such an inter-relation between the two leases as to justify the holding that the unextinguished cost of the first was part of the cost and consideration of the second. We are of the opinion that the respondent did not err in treating as a part of the cost of the new franchise the unamortized cost of the old franchise and amortizing that amount along with additional expenses incurred over the life of the new franchise. IV. - Interest Received on New York City Corporate Stock FACTS. - During the years 1936 and 1937 the petitioner owned $27,000 face amount of obligations of the City of New York bearing interest at the rate of four percent. These obligations, referred to in the petition as "corporate stocks," are also sometimes *510 referred to as "bonds." They were deposited with the City of New York as collateral in connection with the operation of the buses. In its income tax returns for 1936 and 1937 petitioner erroneously included in its gross and net incomes $1,080 for interest received on the obligations. OPINION. - Clearly the interest received by the taxpayer on the obligations of the City of New York is not subject to income tax. The petitioner overstated its net income for each year in the amount of $1,080. This issue is decided in favor of the petitioner. Decision will be entered under Rule 50.