JAMES C. BERRY and CARLYDIA BERRY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Berry v. Commissioner
Docket No. 3258-76.
United States Tax Court
T.C. Memo 1978-65; 1978 Tax Ct. Memo LEXIS 448; 37 T.C.M. (CCH) 326; T.C.M. (RIA) 780065; February 22, 1978, Filed H. Wayne Grant and Richard G. Bonnington, for the petitioners. Stanley H. Smith, Jr., for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioners' Federal income taxes as follows: Year
Amount
1972
$13,775.80
1973
2,516.90
After concessions by petitioners, the sole issue remaining for decision is whether petitioners' unrecovered cost of constructing a parking facility is deductible as an operating expense in 1972 or is includable as a part of their basis for computing gain or loss realized from the 1972 disposition of their rights under a parking lot operating agreement. [1]
FINDINGS OF FACT The parties have filed a stipulation of facts which, together with the exhibits attached thereto, is incorporated herein by this reference. At the time the petition herein was filed, petitioners James C. Berry and Carlydia Berry, husband and wife, resided in Chattanooga, *450 Tennessee. Their 1972 joint Federal income tax return was filed with the Internal Revenue Service Center, Memphis, Tennessee. The matters in controversy herein relate to the business activities of petitioner James C. Berry. Carlydia Berry is a party solely by virtue of having filed a joint return with her husband. Accordingly, James C. Berry will sometimes hereinafter be referred to as petitioner. Petitioner James C. Berry is and was in the year 1972 in the business of operating automobile parking facilities at airports throughout the United States. In 1968 petitioner, doing business as Air Terminal Parking Company, of Chattanooga, Tennessee (hereinafter "Air Terminal Parking"), determined that Jefferson County Airport (hereinafter "Airport"), which served Beaumont, Texas, was projected to have sufficient passenger boardings to make it profitable to operate a pay-parking facility there. After petitioner had made several trips to Jefferson County (hereinafter "County") to discuss his company with County officials, Air Terminal Parking on December 7, 1968, submitted a proposal to obtain various rights to manage and operate a parking concession at the Airport. This proposal was *451 filed pursuant to specifications promulgated by County officials, and was in competition with another bid submitted by an unrelated company. The County accepted petitioner's proposal. On September 2, 1969, the County and Air Terminal Parking entered into an agreement (hereinafter "initial agreement") which provided, in part, as follows: 1. Air Terminal agrees to manage and operate, and County agrees to permit Air Terminal to have exclusive rights to manage and operate, all pay parking facilities in and about the terminal area at the Jefferson County, Texas Airport or in any new terminal area to which commercial scheduled airline operations may be changed during the term of this Agreement. County hereby gives and grants to Air Terminal the exclusive right of possession and control of the subject premises as described in Exhibit "A", hereto attached. This right of possession and control of the premises specified in the agreement was limited to use of the property for commercial parking purposes. In the initial agreement, Air Terminal Parking agreed to pay the County "rentals" over the ten year term of the "agreement and lease" based on the greater of a specified guaranteed *452 amount or a percentage of gross receipts. The County and Air Terminal Parking further agreed that Air Terminal Parking would incur the expense of constructing the initial parking facility at the Airport, known as "Phase I", in the following terms: In addition, Air Terminal agrees to reimburse County for its expenses incurred in the construction of those initial improvements described as Phase I in Exhibit "A", attached hereto and incorporated herein by reference, up to the sum of $50,000.00, such reimbursement to be paid before actual possession of subject premises is assumed by Air Terminal. However, should County elect, it may direct Air Terminal to be responsible for obtention of all or part of the construction of such improvements, subject to approval by County, costs of which shall be borne by Air Terminal. * * * The County ultimately directed Air Terminal Parking to construct and pay for the facility. The initial agreement expressly stated that title to and ownership of any equipment and improvements installed or built by Air Terminal Parking was to vest in the County immediately upon their installation and completion. Air Terminal Parking was not responsible for any *453 ad valorem taxes assessed against the premises or improvements, and no such taxes were ever paid by it. The initial agreement also contained provisions concerning the methods by which the parking business was to be conducted by Air Terminal Parking. Air Terminal Parking promised that it would dispense with the services of any employee whose conduct was detrimental to the Airport and that its employees and the premises would be clean and neat in their appearance. All signs used by Air Terminal Parking were subject to approval by the County. An initial schedule of parking fees to be charged to customers was set forth in the initial agreement. Any changes in this schedule were subject to mutual agreement by Air Terminal Parking and the County. Finally, Air Terminal Parking was required to furnish its services on a fair, reasonable and non-discriminatory basis. However, the initial agreement stated that Air Terminal Parking was to be deemed an independent contractor and operator, and not an agent or employee of the County with respect to the parking venture. As part of the initial agreement, the County promised that, with some specified exceptions, free parking in and about *454 the Airport area would be prohibited, and that the County would assist Air Terminal Parking in every way possible to prevent such prohibited free parking. Pursuant to the terms of the initial agreement and the election of the County that Air Terminal Parking construct the initial parking facility, petitioner let a construction contract to a contractor under which Air Terminal Parking expended $59,000.91. This amount included the costs of grading and paving a parking area for 250 cars, as well as the installation costs of lighting, curbing, fencing, a checkout station, automatic ticket machine, gates and signs. All of the construction paid for by petitioner at the Airport took place on County property. It was necessary for petitioner James C. Berry and his company Air Terminal Parking to obtain an agreement such as the initial agreement from the County before he could in fact operate a parking facility at the Airport. Air Terminal Parking opened for business at the Airport in November of 1970. Prior to this time, parking was free at the Airport and the patrons of the Airport had become accustomed to free parking. Approximately one year after the opening of the pay-parking *455 facility, a problem developed with people parking on the curb or roadway in front of the Airport rather than using the pay-parking facility operated by Air Terminal Parking. Rather than enforce fully the no-free-parking provisions in the initial agreement, the County decided to begin negotiations to repurchase Air Terminal Parking's rights under that agreement with a view to elimination of pay parking at the Airport. On November 27, 1972, Air Terminal Parking and the County entered into a subsequent agreement (hereinafter "subsequent agreement") whereby Air Terminal Parking sold to the County all its rights granted in the initial agreement. The subsequent agreement stated in pertinent part: 1. Air Terminal agrees to sell, transfer, and assign to County, and County agrees to buy from Air Terminal, all exclusive leasehold rights to manage and operate pay parking facilities in and about the terminal area at the Jefferson County, Texas, Airport, or in any new terminal area to which commercial scheduled airline operations may be changed by County, which rights were granted to Air Terminal by County pursuant to written agreement entered into by the parties on September 2, 1969. *456 In exchange for the rights sold by Air Terminal Parking in the subsequent agreement, the County agreed in part as follows: 2. In exchange for the agreement by Air Terminal to sell, transfer, and assign to County those exclusive leasehold rights to manage and operate as aforesaid, County agrees to pay to Air Terminal, within 60 days from the date hereof, the sum of Sixty Thousand ($60,000.00) Dollars. * * * The parking facility and fixtures at the Airport were to remain the property of the County, save for a parking attendant's booth, ticket machine, and electrically operated gate, which petitioner was specifically given the right to remove. The parties did not allocate any portion of the $60,000 paid by the County under the terms of the subsequent agreement to any particular aspect or portion of the initial agreement or to the parking facility itself. The parties understood that pursuant to the initial agreement, all of the parking facilities at the Airport already belonged to the County. In computing income from the Air Terminal Parking facility (shown as Air Terminal Parking of Beaumont on the returns) in their joint income tax return for 1972, petitioners stated that *457 $8,672.27 was depreciation allowed or allowable in prior years on "leasehold [improvements]". After subtracting this amount from $59,000.91 (the total stated cost or basis of the leasehold improvements) on the 1972 return, there remained an unrecovered basis of $50,328.64, which petitioners took as a deduction in full as depreciation of these leasehold improvements allegedly sustained in 1972. Petitioners also reported on their 1972 return a long-term capital gain of $60,000 from the sale of "Lease Rights" obtained in 1970 and sold on November 22, 1972. Petitioners reported that these rights had a zero basis. This $60,000 represented the gain claimed to have been realized from the sale of Air Terminal Parking's rights to the County pursuant to the subsequent agreement. In the statutory notice of deficiency, the Commissioner disallowed $43,259.63 of the $50,328.64 claimed as 1972 depreciation expense on the Airport parking facility on the basis that petitioners were entitled only to depreciate or amortize the cost of the construction of the airport parking facility during the time the facility was operated by the petitioner in 1972. The Commissioner also decreased the $60,000 *458 reported as a long-term capital gain in 1972 by the unrecovered basis of the rights sold in the amount of $40,776.27, thereby determining a long-term capital gain in the amount of $19,223.73 calculated as follows: Sales price
$60,000.00
Less adjusted basis: Original cost
$59,000.91
Less cost of
property retained
Booth
$ 1,258.00
Spitter and gate
3,729.23
(4,987.23)
Cost of leasehold
interest sold
$54,013.68
Less amortization: Prior to 1972
$ 8,672.27
Allowable for 1972
7,069.01
Total amortization
$15,741.28
Less amortization
claimed on prop-
erty not sold
( 2,503.87)
Amortization appli-
cable to leasehold
interest sold
$13,237.41
(13,237.41)
Adjusted basis of
leasehold interest
sold
$40,776.27
(40,776.27)
Long-term capital gain
on leasehold interest
sold, as revised
$19,223.73
The propriety of the "depreciation" deductions in respect of the parking facility for years prior to 1972 is not here in issue. OPINION The basic controversy in this case is whether petitioner may deduct from ordinary income his undepreciated cost of the parking facility improvements while at the same time reporting the $60,000 *459 received from the County as capital gain. We hold that he may not do so. Petitioner's principal contention is that the 1969 agreement was more in the nature of a personal services contract than a lease, that the $60,000 received in 1972 was merely payment for the surrender of his right to anticipated future profits under the contract, and that the unrecovered portion of the $59,000.91 expended to obtain the contract is simply an expense that is deductible from ordinary income. We think that the arrangement with the County was a lease, and that when it was sold back to the County in 1972, the unrecovered cost of the leasehold improvements represents merely the remaining cost of the lease -- i.e., its adjusted basis -- which must be subtracted from the 1972 proceeds to determine the amount of taxable long-term capital gain. Alternatively, even if the original arrangement is to be regarded as a contract for personal services, petitioner is still not entitled to prevail, as will hereinafter be explained. In arguing that the initial agreement did not convey a leasehold or other interest in property, petitioner claims that the exclusive possession and control of the property remained *460 with the County and were not given to Air Terminal Parking. But while it may be true, as petitioner contends, that an exclusive right of possession of landby the lessee is an essential element of a lease, see, e.g., Brown v. Johnson,118 Tex. 143, 12 S.W. 2d 543, 545, we do not agree that the initial agreement was not intended to and did not pass such a right to Air Terminal Parking. Paragraph 1 of the initial agreement provides in part that: County hereby gives and grants to Air Terminal the exclusive right of possession and control of the subject premises as described in Exhibit "A" * * *. This provision could not more clearly demonstrate an intention to convey an interest of the sort which is required for a valid lease of real property in Texas. See Brown v. Johnson,supra;Byrd v. Feilding,238 S.W. 2d 614 (Ct. of Civ. App.); Mallam v. Trans-Texas Airways,227 S.W. 2d 344 (Ct. of Civ. App.). Furthermore, other portions of the initial agreement refer to payments made thereunder as "rentals", [2] and to the County and Air Terminal Parking as "lessor" and "lessee". The initial agreement also states *461 that the term of the "Agreement and Lease" was to be for a period of ten years. The subsequent 1972 agreement speaks in terms of a sale of "exclusive leasehold rights".All of these references reinforce our conclusion that, viewed as a whole, the agreement was intended to be a lease of real property. It was therefore sufficient under state law to convey an estate in that property to petitioner. Brown v. Johnson,supra.This case is thus distinguishable from cases where the only basic right granted by a contract is a right to receive future ordinary income from services and where no "property interest" is passed. Compare King Broadcasting Co. v. Commissioner,48 T.C. 542, 550-552, with United States v. Dresser Industries, Inc.,324 F. 2d 56, 58-59 (C.A. 5); Commissioner v. Ferrer,304 F. 2d 125, 130-131 (C.A. 2), and Kingsbury v. Commissioner,65 T.C. 1068, 1080-1086. Petitioner stresses the various "controls" the County had over the operation *462 of the parking facility, and urges us to conclude for Federal income tax purposes that these "controls" are incompatible with a lease. Among these "controls" were promises to remove employees of Air Terminal whose conduct was detrimental to the Airport, to keep the premises clean, and a right to disapprove signs used at the facility. Air Terminal Parking also affirmatively promised to manage and operate the facility, and was given the exclusive right to use the land only for commercial parking purposes and on a nondiscriminatory basis. Changes in parking rates were to be the subject of mutual agreement. We are not convinced, however, that these "controls" or restrictions require us to characterize the initial agreement as a right to future ordinary income and not a lease.
The substance of the initial agreement was for Air Terminal Parking to operate a business using land, in return for rent based on a percentage of gross receipts, with a minimum annual guaranteed rental. We conclude that the initial agreement resembled a "percentage" lease, which has been defined as an agreement by the *463 tenant to pay as rent a stipulated percentage of gross revenues from sales or services from the use of the premises. S. McMichael & P. O'Keefe, Leases: Percentage,Short and Long Term 32 (5th ed. 1959); M. Friedman, 1 Friedman on Leases, sec. 6.1 (1974). Because the compensation paid to the County in a percentage lease transaction depended directly on the manner in which Air Terminal Parking operated the business, it is not unusual that the initial agreement contained covenants relating to Air Terminal's exclusive right and obligation to manage and operate the facility. See generally S. McMichael & P. O'Keefe, supra, at 56-61; M. Friedman, supra, sec. 6.10. It is also common in a lease to limit the use to which the premises will be put, and to impose obligations regarding the appearance, maintenance, and care for the property. S. McMichael & P. O'Keefe, supra, at 15, 18. This is especially true in a case where the landlord retains for himself property adjacent to the leased premises. Finally, it should also be noted that the initial agreement specified that Air Terminal Parking was to be an "independent contractor" and not an agent or employee of the *464 County. This indicates an intention of the parties that Air Terminal Parking was not to be under the direct control of the County. We conclude that under the facts of this case, none of the "controls" are inconsistent with a percentage lease, but rather are of a type appropriate for protecting a landlord's interest. Compare University Hill Foundation v. Commissioner,51 T.C. 548, 568-569, reversed on other grounds 446 F.2d 701 (C.A. 9), cert. denied 405 U.S. 965. We are further influenced by several additional factors in our conclusion that the initial agreement transferred a leasehold interest in real property and was not a personal services contract. As a result of the minimum guaranteed rentals, all risk of loss from operation of the property was on Air Terminal Parking and not on the County. Furthermore, the percentage rental payable to the County was based on gross receipts from the parking facility, not on profits. These allocations of risk are consistent with a lease arrangement and not with a personal services contract. See State National Bank of El Paso v. United States,509 F. 2d 832, 835 (C.A. 5); *465 Kingsbury v. Commissioner,supra,65 T.C. at 1084, 1086. [3] Finally, Air Terminal Parking was required to expend some $59,000 to construct a parking facility on Airport property. While such expenditures are typically made by a lessee in exchange for a lease, they are not ordinarily required in personal services contracts. See Kingsbury v. Commissioner,supra, at 1084-1085. Having concluded that the initial agreement was a lease and not a right to future ordinary income, we now turn to the proper treatment of the construction expenditures. We hold that the cost of those expenditures must be capitalized and set off against the proceeds received from the 1972 sale. Petitioner suggests that his expenditures did not represent his "cost" basis for obtaining the initial agreement because it may have been possible to obtain the initial agreement without incurring such expenses by having the County construct the facility and paying a higher rent. This argument is without merit. *466 Section 1012 provides that the basis of "property" is its cost. A lease of real property is "property", being either a capital asset or section 1231 property if used in a trade or business. See Commissioner v. Ferrer,304 F. 2d 125, 130-131 (C.A. 2), Kingsbury v. Commissioner,supra, at 1085, and cases cited therein. Expenses of acquiring section 1231 or capital assets having a life greater than one year are not deductible as business expenses in the year incurred, and must be capitalized and included in the section 1012 basis of the asset. See section 263; Hudgins v. Commissioner,55 T.C. 534, 537; Pasadena City Lines, Inc. v. Commissioner,23 T.C. 34, 39.This rule, of course, applies to leases. Sec. 1.162-11(a), Income Tax Regs.; Jos. N. Neel Co. v. Commissioner,22 T.C. 1083, 1089. In this case, petitioner was required by the terms of the initial agreement to pay the cost of constructing the initial parking facility. The lease and the facility itself both had a life greater than one year. As such, petitioner's expenditures were consideration for the lease *467 and are included in petitioner's basis for the lease. Jos N. Neel Co. v. Commissioner,supra, at 1089. However, the result would be the same whether the improvements are treated as a "cost" of acquiring the lease, or as capital "improvements" or "additions" to leased property. that the lease will not be renewed, extended, or The cost of capital improvements by a tenant to leased property must be capitalized and included in basis, even if the improvements were required by the terms of the lease. Sections 263, 1016(a); sections 1.162-11(b), 1.1016-2(a), Income Tax Regs.; Duffy v. Central R.R.,268 U.S. 55; Hotel Kingkade v. Commissioner,180 F. 2d 310 (C.A. 10). The same result would obtain even if the required improvements were treated as prepaid rent. See, e.g., Main & McKinney Bldg. Co. v. Commissioner,113 F. 2d 81 (C.A. 5), certiorari denied 311 U.S. 688; Jos. N. Neel Co.,supra, at 1089. Therefore, it is irrelevant whether or not Air Terminal Parking could or could not have obtained the initial *468 agreement without paying for construction of the parking facility. What is relevant is that petitioner did in fact make the expenditures for the facility pursuant to the terms of the initial agreement, and that they were capital expenditures. Their cost therefore is included in the basis of the lease. Sections 1012, 1016(a). [4] It follows that the unrecovered basis for the lease must be set off against the proceeds received under the 1972 subsequent agreement in order to calculate the gain (or loss) realized from the sale of the leasehold. Sections 1001, 1011; Guelph Hotel Corp. v. Commissioner,7 B.T.A. 1043. However, even if petitioner is correct in his contention that there was no lease and that the 1972 payment was merely in respect of his anticipated future profits under the initial agreement, he would be in no better position. For, the $60,000 paid to him in 1972 under that hypothesis would have to be treated as ordinary income rather than capital gain. United States v. Eidson,310 F. 2d 111 *469 (C.A. 5); Flower v. Commissioner,61 T.C. 140, affirmed 505 F. 2d 1302 (C.A. 5). The result would be an even greater deficiency than that determined by the Commissioner. Although the Government would not be entitled to an increased deficiency in the absence of an amendment to the pleadings, the foregoing serves to underscore our conclusion that petitioner's basic position is unsound, regardless of whether the initial contract of 1969 is regarded as a lease or merely a contractual arrangement for the performance of personal services. Petitioner makes two other alternative arguments -- one based upon section 178, I.R.C. 1954, and the other upon the failure to make an allocation in the 1972 subsequent agreement. Relying upon section 178, petitioner contends that it permits "rapid amortization" of leasehold acquisition costs or improvement costs if the lease is terminated or cancelled prior to the natural expiration of the term set forth in the lease. Relevant portions of section 178 are set forthin the margin. [5]
*470 Petitioner contends that the theory behind section 178 is to cause leasehold costs to be completely amortized by the last year of actual possession of the leasehold, taking into account possible renewals or extensions of the original lease term. He argues that this theory requires that when a lease is cancelled before its normal term expires, leasehold costs should similarly be completely amortized in the last year of possession.
Petitioner's argument must be rejected. Section 178(a) and (c) applies only to the proper amortization period of leasehold costs in cases where the lease may be extended beyond its original term "pursuant to an option exercisable by the lessee". See sections 1.178-1(b)(1), 1.178-3(a) and (b), Income Tax Regs. In the instant case, petitioner was given no such option in the original agreement, either to continue or to shorten the stated ten-year term of the initial agreement. Thus, the language of section 178 does not apply to this case. The legislative history of section 178 makes it clear that section 178 was not intended to go so far as petitioner *471 suggests. Section 178 was passed to remedy the problem of overly rapid amortization of leasehold costs when it is probable that the tenant will exercise an option to retain the leasehold beyond its original stated term. See H. Rept. No. 775, 85th Cong., 1st Sess. 12 (1957); S. Rept. No. 1983, 85th Cong., 2nd Sess. 134-137 (1958). In the absence of any indications to the contrary in the legislative history, we must conclude that section 178 was not intended to affect the tax treatment of leasehold costs when the tenant realizes a gain from early leasehold termination. Compare Conn v. Commissioner,16 B.T.A. 73 (suggesting that premature termination of a lease does not shorten the period for amortization of leasehold costs, at least when a new lease or some other form of consideration is received), and North Shore Bus Co. v. Commissioner,1 T.C.M. 493, 12 P-H Memo. T.C. par. 43,041, affirmed on other grounds 143 F. 2d 114 (C.A. 2) (same rule in case of franchise costs), with Brekke v. Commissioner,25 T.C.M. 1063, 1064-1065, 35 P-H Memo. T.C. par. 66,208 *472 (unrecovered leasehold costs deductible upon lease termination if no consideration paid to lessee). Finally, petitioner argues that because none of the $60,000 consideration was allocated to the parking facility in the 1972 subsequent agreement, he is entitled to deduct its unrecovered cost in 1972. This argument misses the point. It is true that petitioner did not sell the leasehold improvements in 1972, because they already belonged to the County. However, the cost of the facility became the basis for the leasehold rights which were sold, and the adjusted basis of the leasehold must be offset against the $60,000 received from the County in order to calculate gain from the 1972 sale. Decision will be entered for the respondent. Footnotes
1. As a result of the concessions, the deficiency for the year 1973 is no longer at issue.↩
2. In Texas, a landlord-tenant relationship is necessary to sustain an action for "rent". See Brown v. Johnson,supra.↩
3. See also Meagher v. Commissioner,T.C. Memo. 1977-270↩.
4. Such expenditures are, of course, subject to an allowance for depreciation or amortization. Sections 1.162-11, 1.167(a)-4, Income Tax Regs.↩
5. SEC. 178. DEPRECIATION OR AMORTIZATION OF IMPROVEMENTS MADE BY LESSEE ON LESSOR'S PROPERTY. (a) General Rule.--Except as provided in subsection (b), in determining the amount allowable to a lessee as a deduction for any taxable year for exhaustion, wear and tear, obsolescence, or amortization-- (1) in respect of any building erected (or other improvement made) on the leased property, if the portion of the term of the lease (excluding any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee) remaining upon the completion of such building or other improvement is less than 60 percent of the useful life of such building or other improvement, or (2) in respect of any cost of acquiring the lease, if less than 75 percent of such cost is attributable to the portion of the term of the lease (excluding any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee) remaining on the date of its acquisition, the term of the lease shall be treated as including any period for which the lease may be renewed, extended or continued pursuant to an option exercisable by the lessee, unless the lessee establishes that (as of the close of the taxable year) it is more probable continued for such period than that the lease will be so renewed, extended, or continued. * * *
(c) Reasonable Certainty Test.--In any case in which neither subsection (a) nor subsection (b) applies, the determination as to the amount allowable to a lessee as a deduction for any taxable year for exhaustion, wear and tear, obsolescence, or amortization-- (1) in respect of any building erected (or other improvement made) on the leased property, or (2) in respect of any cost of acquiring the lease, shall be made with reference to the term of the lease (excluding any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee↩), unless the lease has been renewed, extended, or continued or the facts show with reasonable certainty that the lease will be renewed, extended, or continued. (Emphasis supplied.)